UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

River Downs Investment Company,

  Plaintiff,

                 Case No. 1:11-cv-721

v.

                 Judge Michael R. Barrett

Sportech Racing, LLC,

  Defendant.

## **OPINION & ORDER**

This matter is before the Court upon the parties' Cross-Motions for Summary Judgment (Docs. 16, 18) and responsive briefs. (Docs. 21, 22, 25).

### **I. Background**

Plaintiff River Downs is the former operator of a horse racing track in Cincinnati, Ohio. (Doc. 16-1, Edward Jack Hanessian Decl. ¶ 1). In 1996, Sportech[1] began to provide "interface services" to River Downs. (Id., ¶ 2). Interface services allow bettors at a "guest" track to place real-time wagers on races at other tracks, known as "host" tracks. (Id., ¶ 3). These races are known as "simulcast" races. (Id.) River Downs agreed to pay Sportech for the interface services at a rate of $0.00125 for each dollar wagered at River Downs. (Id., ¶ 4). Sportech sent weekly invoices to River Downs, and until April of 2001, River Downs paid the invoices in full. (Id.)

River Downs claims that during this period of time there was no written agreement between the parties. (Id.) However, Sportech explains that there was a

---

[1]Sportech was formerly known as Scientific Games Racing, LLC.

written standardized form agreement, but River Downs never signed the agreement. (Doc. 18-1, Brooks H. Pierce Decl., ¶ 9).

In the early part of 2001, Sportech notified River Downs that it intended to increase its charge for interface services from $0.00125 to $0.0015 for every dollar wagered and would begin charging a $25.00 daily minimum (the "California minimum") for interface services involving certain host tracks in California. (Id., ¶ 10). Sportech sent River Downs a written agreement which included these terms, but River Downs refused to sign the agreement ("the 2001 Interface Agreement"). (Hanessian Decl., ¶ 5.) In a letter dated February 6, 2001, Jack Hanessian, general manager for River Downs, informed Sportech that:

> I find your proposal [regarding the increase in charges] totally repugnant to the survival of the racing industry. Not only would your thoughtless proposal add an additional $120,000 to our costs of operation, it would force us to cancel our relationship with smaller tracks who use Autotote. Where did the $50.00 minimum come from? It is arbitrary and has no bearing to the real world.
>
> River Downs, along with many other tracks, use Amtote's Ohio hub to interface with several Autotote tracks. There is but a single port used to connect with Autotote;s track. It seems to me that this would qualify as a single source. Each participating track within the Ohio hub would be responsible for its proportionate share of the interface fee based on the traditional .00125.

(Doc. 19-1). Hanessian concluded by explaining that "[i]f you insist on implementing this rate increase, River Downs will likely drop all small Autotote tracks and will actively encourage these tracks to change its tote company to one without such an oppressive rate structure." (Id.)

Beginning in April of 2001, Sportech's weekly invoices to River Downs included charges for interface services calculated at the $0.0015 rate and the California

minimum. (Id., ¶ 6). Each week, Hanessian recalculated the amount due using the $0.00125 rate and subtracting the California minimum. (Id.) Hanessian noted his revised calculation on a copy of the invoice and on the remittance advice, had a check prepared in the revised amount, and sent the check, the modified invoice, and the modified remittance advice to Sportech. (Id.)

From 2001 to 2009, Hanessian followed this procedure, or a similar procedure, with every Sportech invoice. (Id., ¶ 7). Sportech accepted and cashed River Downs' payment checks made out for the revised amounts. (Id., ¶ 8). In addition, Sportech continued to provide interface services to River Downs. (Id.) Sportech argues that because of the "hub" structure that it was unable to terminate interface services to River Downs only. (Pierce Decl., ¶ 13). Sportech explains that the wagers transmitted to Sportech included not only those of River Downs, but all the wagers bundled from other tracks within the Ohio hub. (Id.)

Sportech claims that between 2001 and 2005, its accounts receivable department made periodic phone calls to River Downs in an attempt to collect the unpaid balance of the invoices. (Doc. 18-7, Elizabet Pacheco Cortes Aff., ¶ 6).[2]

---

[2] Attached to the Cortes Affidavit is a record which Cortes explains is a record from "a long discontinued accounting system known as 'Solomon,' from with we just determined how to retrieve some data." The record appears to collect notes from telephone and fax communications with River Downs. The notes are cryptic at best, however, the relevant entries are:

> 12/09/99 . . . Spoke w/Jack, will not pay CA min. his [*sic*] position is that the state of Ohio as a total unit meets the minimums and we choose to bill by unit, track, which is not his problem.
>
> . . .
>
> 8/21 per Jack will review the invoice, busy time of the year, not sure when he will have the time. Not sure what the billing is and spoke w/Thistle also. rw.

3

However, the weekly invoices themselves do not show a past due amount. (See, e.g., Doc. 16-1, at 6-9).

In a letter dated September 30, 2009, Sportech demanded that River Downs pay past due charges in the amount of $118,535.38. (Doc. 18-5). Hanessian contacted Sportech in an effort to resolve the matter. (Hanessian Decl., ¶9). River Downs agreed to start paying the $0.0015 rate, but did not agree to pay the California minimum or any part of the past due amount. (Id.)

Beginning in November 2009, River Downs paid the $0.0015 rate but Hanessian continued to mark Sportech's remittance advices as he had in the past, showing River Downs' revisions and the amount River Downs was actually paying. (Id., ¶10). Sportech continued to accept and cash River Downs' checks. (Id.) Sportech also continued to provide interface services. (Id.)

Sportech claims that at some time in 2009, it sent a new agreement to River Downs ("the 2009 Interface Agreement"). (Pierce Aff., ¶ 15). This agreement provided that "Recipient will be deemed to have accepted the terms and conditions set forth herein upon placing any wagers to host tracks using [Sportech's] services." (Doc. 18-6).

---

> 01/22/2003 fax over to jack req. for payment 09/28/2002   57839-09/21/2002   57480-09/14/2002   57153-09/07/2002   56851 Attached are copies of our invoice that are past due. Just a reminder that our policy requires payment within net ten days. We would appreciate prormt [*sic*] payment. I have sent copies before…er
>
> . . .
>
> 1/20/05 – According to Jack the reason the tote invoices are being short paid is due to: Sales tax they have an exemption letter, the rate increase from 00125 to 00150 and the California minimums…LH
>
> 10/5/05 – faxed short paid decoder invoice to Jack 254401 6/30/05…lh

(Doc. 18-10, at 2).

4

However, Hanessian claims that River Downs did not receive a copy of the 2009 Interface Agreement.  (Hanessian Second Decl., Doc. 23, ¶ 5).  There is no evidence in the record that River Downs ever signed a copy of this agreement.

On January 28, 2011, pursuant to an Asset Purchase Agreement, River Downs sold its assets to PNK (Ohio), LLC, an affiliate of Pinnacle Entertainment, Inc. (collectively, "Pinnacle").  (Id., ¶12).  Pinnacle did not assume any liability that River Downs owed to Sportech.  (Id., ¶13).

By letter dated March 22, 2001, Sportech demanded that River Downs pay a past due amount of $125,951.61, which included charges through March 5, 2011.  (Doc. 18-11, John A. Godfrey Aff., ¶7-8; Doc. 18-20, Godfrey Aff., Exh. D).  Pinnacle responded to the letter, explaining that Pinnacle was only responsible for a "small portion of this outstanding amount" and the remainder was "the responsibility of River Downs Investment Company."  (Doc. 18-22, Godfrey Aff., Exh E).  On July 18, 2011, through counsel, Sportech demanded payment of the $125,951.61 from Pinnacle and River Downs.  (Godfrey Aff. ¶ 10; Doc. 18-23, Godfrey Aff., Exh. F).  In response, Pinnacle objected to the release of funds from an escrow fund which was established according to the Indemnification Escrow Agreement between River Downs and Pinnacle as part of the asset sale.  (Id., ¶15).  Sportech and Pinnacle entered into an agreement with regards to the claims between them.  (Doc.17-1, Hannessian Decl., Ex. C). Throughout these discussions, Sportech continued to provide interface services.

In its Complaint, River Downs brings claims for declaratory judgment (Count One), tortious interference (Count Two), negligence (Count Three) and libel (Count Four).  River Downs has agreed to not pursue Counts Three and Four.  (Doc. 16, at

5

n.1). On November 1, 2011, Sportech filed counterclaims against River Downs for breach of contract and conversion. (Doc. 7).

In cross motions for summary judgment, the parties seek summary judgment in their favor on their own claims, and dismissal of the claims against them.

## II. Analysis

### A. Motion for Summary Judgment Standard

Federal Rule of Civil Procedure 56(a), as amended on December 1, 2010, provides that summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party has the burden of showing an absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catre*tt, 477 U.S. 317, 325 (1986). Once the moving party has met its burden of production, the non-moving party cannot rest on his pleadings, but must present significant probative evidence in support of his complaint to defeat the motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). The mere existence of a scintilla of evidence to support the non-moving party's position will be insufficient; the evidence must be sufficient for a jury to reasonably find in favor of the non-moving party. *Id.* at 252. These standards upon which the court evaluates motions for summary judgment do not change simply because the parties present cross-motions. *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991).

### B. River Down's claim for declaratory judgment and Sportech's claim for breach of contract

River Downs seeks a declaration that it owes no debt or other obligation to Sportech. In its counterclaim, Sportech claims that River Downs breached the 2001

6

and 2009 Interface Agreements.

River Downs argues that beginning in 1996, there was an oral agreement between the parties that Sportech would provide interface services and River Downs would pay the $0.00125 rate. River Downs argues that Sportech's 2001 proposed increase in the rate and the addition of the California minimum was an offer, to which River Downs responded with a counteroffer of the same rate without the California minimum. River Downs argues that Sportech accepted the counteroffer by accepting and cashing River Down's checks and continuing to provide interface services. River Downs argues that in 2009, this offer-counteroffer-acceptance process was repeated when River Downs agreed to pay the increased rate, but refused to pay the California minimum or any past due amount.

Sportech views the same facts differently. Sportech claims that River Downs is bound by the 2001 Interface Agreement, even if River Downs refused to sign the agreement. Sportech maintains that River Downs' continued use of Sportech's interface services constituted acceptance of the 2001 Interface Agreement. As to the 2009 Interface Agreement, Sportech claims that the language of the agreement itself provides that continued use of the interface services constitute acceptance of the agreement. Sportech claims that the failure to pay the past due charges under the 2001 and 2009 Interface Agreements is a breach of contract.

To prove a breach of contract under Ohio law,[3] the following elements must be established: (1) the existence of a valid contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) damage or loss to the plaintiff. *Samadder v. DMF of*

---

[3] Sportech points out that the 2009 Interface Agreement provides that New York law should govern. However, because Sportech believes that New York and Ohio law are the same on the applicable principles, Sportech does not object to the application of Ohio law.

7

*Ohio, Inc.*, 798 N.E.2d 1141, 1147 (Ohio 2003).

Under Ohio law, the existence of a contract is generally determined by a court as a matter of law.  *Reali, Giampetro & Scott v. Soc. Natl. Bank*, 729 N.E.2d 1259, 1264 (Ohio Ct. App. 1999) (citing *Doe v. Adkins*, 674 N.E.2d 731, 736-37 (Ohio Ct. App. 1996)).  "In order to declare the existence of a contract, both parties to the contract must consent to its terms; there must be a meeting of the minds of both parties; and the contract must be definite and certain."  *Episcopal Ret. Homes, Inc. v. Ohio Dept. of Indus. Relations*, 575 N.E.2d 134, 137 (Ohio 1991) (citations omitted).

The Court concludes that River Downs was not bound by the 2001 Interface Agreement.  River Downs refused to sign the agreement.  The Court notes that a lack of a signature is not dispositive.  *See Thomas H. Jacoby & Associates, Inc. v. Jednak Floral Co.*, 90AP-1228, 1991 WL 232262, *3 (Ohio Ct. App. Nov. 7, 1991) ("an agreement need not necessarily be signed by the parties in order to constitute a written agreement.").  However, the February 6, 2001 letter from Hanessian makes it clear that River Downs did not consent to the increase in the rate and the addition of the California minimum.  Hanessian had strong objections to the increased charges.  Hanessian called the increased charges "totally repugnant to the survival of the racing industry."  Hanessian also called the California minimum "arbitrary" and having "no bearing to the real world."  Hanessian had a "single source" theory under which each track within the "Ohio hub" would pay a proportionate share of the interface fee "based on the traditional .00125."  Therefore, River Downs did not consent to the terms of the 2001 Interface Agreement.

While the 2001 Interface Agreement may not have been binding upon River

Downs, there was a contract between the parties. Ohio recognizes three categories of contracts: express, implied in fact, and implied in law. *Legros v. Tarr*, 540 N.E.2d 257, 263 (Ohio 1989). As the Supreme Court of Ohio has explained:

> In express contracts the assent to its terms is actually expressed in offer and acceptance. In contract implied in fact the meeting of the minds, manifested in express contracts by offer and acceptance, is shown by the surrounding circumstances which made it inferable that the contract exists as a matter of tacit understanding. In contracts implied in law there is no meeting of the minds, but civil liability arises out of the obligation cast by law upon a person in receipt of benefits which he is not justly entitled to retain and for which he may be made to respond to another in an action in the nature of assumpsit.

*Id.* (quoting *Hummel v. Hummel*, 14 N.E.2d 923, 925-26 (Ohio 1938)).

The Court concludes that in 2001, the parties entered into an implied-in-fact contract based on the "surrounding circumstances, including the conduct and declarations of the parties." *Stepp v. Freeman*, 694 N.E.2d 510, 514 (Ohio Ct. App. 1997). By accepting the modified amount of payment and continuing to provide interface services, Sportech implicitly agreed to the $0.00125 rate and subtraction of the California minimum. These circumstances "make it inferable that the contract exists as a matter of tacit understanding." *Id*.

The Court's conclusion is not altered by the evidence of periodic phone calls from Sportech to River Downs in an attempt to collect the unpaid balance of the invoices. Despite the calls, River Downs continued to pay the modified amount, which Sportech accepted and then continued to provide interface services.

Similarly, regardless of whether River Downs received a copy of the 2009 Interface Agreement, it is clear that there was not an agreement as to the rate for the interface services. In response to Sportech's September 30, 2009 letter, River Downs

9

agreed to start paying the $0.0015 rate, but did not agree to pay the California minimum or any of the past due amount. Accordingly, River Downs continued to pay Sportech's invoices in a revised amount. Sportech accepted the checks in these revised amounts and also continued to provide interface services. Under these circumstances, the Court concludes that River Downs was not bound by the 2009 Interface Agreement, but was instead operating under an implied-in-fact contract. *See Nexus Communications, Inc. v. Qwest Communications Corp.*, 953 N.E.2d 340, 348 (Ohio Ct. App. 2011) ("An implied-in-fact contract arises from the conduct of the parties or circumstances surrounding the transaction that make it clear that the parties have entered into a contractual relationship despite the absence of any formal agreement.").

Therefore, River Downs' Motion for Summary Judgment is GRANTED to the extent that it seeks a declaration that it owes no debt or other obligation to Sportech; and Sportech's Motion for Summary Judgment is DENIED to the extent that it seeks summary judgment on its claim for breach of contract.

### C. River Down's claim for tortious interference

River Downs argues that it is entitled to summary judgment on its claim of tortious interference. River Downs claims that Sportech caused Pinnacle to breach the Asset Purchase Agreement between Pinnacle and River Downs. River Downs claims that Sportech threatened Pinnacle with a baseless claim unless Pinnacle agreed not to release the funds held in escrow until Sportech's counterclaims in this action were resolved.

Under Ohio law, the elements of tortuous interference with a contract are "(1) the existence of a contract, (2) the wrongdoer's knowledge of the contract, (3) the

wrongdoer's intentional procurement of the contract's breach, (4) the lack of justification, and (5) resulting damages." *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 858 (Ohio 1999).

The Court notes that River Downs has not specifically identified how any agreement between River Downs and Pinnacle has been breached. Moreover, there is no evidence in the record that River Downs has claimed that Pinnacle has breached a contract. (See Godfrey Aff., ¶ 12 ). Therefore, River Downs' Motion for Summary Judgment is DENIED to the extent that it seeks summary judgment on its claim for tortious interference; and Sportech's Motion for Summary Judgment is GRANTED to the extent that it seeks summary judgment on River Downs' claim for tortious interference.

### D. Sportech's claim for conversion

Under Ohio law, the elements of a conversion cause of action are typically "(1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages." *Dice v. White Family Cos.*, 878 N.E.2d 1105, 1109 (Ohio Ct. App. 2007). Based on the Court's ruling above, the Court finds that Sportech is unable to prove the elements of its conversion claim. Therefore, River Downs' Motion for Summary Judgment is GRANTED to the extent that it seeks summary judgment on Sportech's claim for conversion; and Sportech's Motion for Summary Judgment is DENIED to the extent that it seeks summary judgment on its claim for conversion.

### III. Conclusion

Based on the foregoing, Plaintiff River Downs Investment Company's Motion for Summary Judgment (Doc. 16) is **GRANTED in PART and DENIED in PART**; and

Defendant Sportech Racing, LLC's Motion for Summary Judgment (Doc. 18) is **GRANTED in PART and DENIED in PART**.

Because no claims remain pending before this Court, this matter shall be **CLOSED and TERMINATED** from the docket of this Court.

    **IT IS SO ORDERED**.

                                                    */s/ Michael R. Barrett*
                                                United States District Judge